UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:18-CR-137 |
| | ) | |
| MIZRAIN LUJANO | ) | |

**OPPOSITION TO MOTION FOR COMPASSIONATE RELEASE**

The Court should deny Mizrain Lujano's Motion for Compassionate Release (doc. 102) because it proffers no extraordinary and compelling health condition; it describes family circumstances that are typical for an incarcerated person of Lujano's age; and it overstates Lujano's conduct while in the custody of the BOP. Furthermore, even if the Court concluded that Lujano presented extraordinary and compelling reasons that might warrant a reduction in his sentence, consideration of 18 U.S.C. § 3553(a) factors – including Lujano's history and characteristics – weigh heavily against a reduction in sentence.

## I.     Background

### a.  Defendant's Background and Facility Status

Following his plea to conspiracy to distribute more than 500 grams of cocaine, on March 3, 2020, the Court imposed a 72-month prison sentence on Mizrain Lujano, to be followed by a four-year term of supervised release.

Lujano has been serving his sentence principally at FCI Schuykill, in Pennsylvania.  As of last month, Lujano had served about 59% of his sentence.  He has about 24 months left to serve before his projected January 8, 2024 release date.

Lujano tested positive for COVID-19 on December 10, 2020.  Following 10 days of medical isolation he was free of any symptoms.   He did not report any COVID-19-like symptoms at any time, and by January 4, 2021, his case was considered resolved.[1]  Lujano is 33-years old.  Based on his medical records, the Bureau of Prisons ("BOP") categorizes Lujano as a "care level 1" inmate.  That means he is one of the healthier inmates with either no medical issues, or an inmate with only a simple chronic condition.

In April 2021, Lujano was disciplined for possessing an unauthorized item within his cell when prison staff found a food tray lid wrapped in a towel in his cell.  Such items are prohibited because they can be altered into dangerous weapons, or used as shields or body armor.  Lujano admitted the item was his and not his cell mate's, and explained he forgot to return it to the food cart.  The report of investigation notes Lujano "displayed a poor attitude during the investigation." The disciplinary record noted that Lujano stayed calm during the hearing about the

---

[1] Lujano's counsel has moved to withdraw (doc. 103) based upon his retirement from the practice of law.  Lujano's BOP records (medical, disciplinary, and inmate profile) will be provided to his successor counsel once an appearance is entered.

incident.  BOP records indicate he received a punishment of "LP VISIT/15 DAYS/CS" (which is understood to reflect a loss of privileges for 15 days).  The BOP considers Lujano to be a medium level inmate who presents a high risk of recidivism.

As of January 5, 2022, the FCI Schuykill reported that two inmates (out of 980 total inmates) and two staff were currently testing positive for COVID-19; there had been zero inmate and staff deaths attributable to the virus; and 425 inmates and 73 staff had recovered from the virus.

### b.  Offense Conduct and Sentencing

As of early 2018, DEA learned from various sources of information that Lujano had been distributing cocaine and other drugs in and around Chittenden County.  Investigators discerned that in late March 2018 Lujano and a co-conspirator named Deguise drove from Vermont to North Carolina to obtain cocaine for distribution in Vermont.  In the fall of 2018 Lujano and Deguise also traveled to Boston, New York City, and Maine, to acquire additional cocaine for distribution in Northwestern Vermont.   PSR ¶¶  13-14, 28-33.  Lujano also trafficked in guns, paying off a drug debt with a .38 caliber Smith and Wesson, a .23 caliber Glock, a "little" .380 as well as ammunition.  PSR ¶ 22.  Lujano's guideline range reflected that he trafficked in between 5 and 15 kilograms of

cocaine, and that he possessed firearms during the course of the conspiracy. Significantly, Lujano engaged in this conduct while he was subject to state-imposed conditions.  PSR ¶ 61.

This was Lujano's second drug distribution felony.  In 2013, at the age of 24, he was convicted in Illinois of possession of more than two kilograms of marijuana and was sentenced to three years in prison.  After his release from Illinois prison, he incurred convictions in Vermont for Disorderly Conduct- Fight-Hate Crime in 2017, Simple Assault and unlawful trespass (also in 2017), and DUI in 2018.  Prior to his Illinois arrest, in 2012 Lujano shot and killed a man who Lujano believed was seeking to rob him of drug proceeds.  PSR ¶ 9.

At sentencing, Lujano argued that his "very close relationship with his two daughters, his mother, and his twin sister" should be factored into the Court's sentencing decision.  Doc. 92, at 8-10.  His sentencing memorandum emphasized Lujano's "generosity, loyalty, and his love of family."   He asked the Court to impose the mandatory minimum 60-month sentence.  The Court considered Lujano's family relationships in imposing a sentence that was significantly below the 121 month low-end of the advisory Guideline range.

## II.    Legal Framework

A judgment of conviction that includes a term of imprisonment is a final judgment and can be modified only in limited circumstances.  *See generally United States v. Dillon*, 560 U.S. 817, 825 (2010).  When it enacted the Comprehensive Crime Control Act of 1984, Congress gave BOP exclusive power to move the sentencing court to reduce a defendant's sentence, when BOP concluded "extraordinary and compelling reasons" warranted the reduction, under 18 U.S.C. § 3582(c)(1)(A).  Congress did not define "extraordinary and compelling reasons" as that term appears in Section 3582, but directed the Sentencing Commission to "promulgat[e] general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A)" that "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t).  The policy statement, U.S.S.G. § 1B1.13, states that the Court "may reduce a term of imprisonment" if "extraordinary and compelling reasons" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The First Step Act broadened the class of prisoners who could obtain judicial review of compassionate release requests by eliminating BOP's screening role.  An

inmate who has exhausted administrative remedies now may move directly in the district court for a sentence reduction; the Court then first considers whether "extraordinary and compelling reasons" make the defendant eligible for release.

The Second Circuit, meanwhile, has held the policy criteria enumerated in U.S.S.G. § 1B1.13 were not binding upon courts evaluating such motions by defendants. Rather, the court concluded that until the U.S. Sentencing Commission regains a voting quorum and amends the Guidelines to incorporate the First Step Act's changes, district courts have the authority to determine for themselves whether "extraordinary and compelling reasons" exist to justify a reduction in a sentence upon the defendant's motion. *See United States v. Brooker*, 976 F.3d 228, 236-37 (2d Cir. 2020).[2] District courts accordingly have "discretion to consider whether any reasons are extraordinary and compelling." *Id.* at 236. "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *Id.* at *237-38 (quoting, with emphasis added in *Brooker*, 28 U.S.C. § 994(t)). The *Brooker* Court noted some factors—such as the defendant's age, an

---

[2]     The *Brooker* decision arose from a District of Vermont case that involved multiple named defendants—including Jeremy Zullo, whose individual appeal led to the Second Circuit opinion referenced here.

unusually long original sentence, and the impacts of the coronavirus pandemic—could have "possible relevance, whether in isolation or combination." *Id.* at 238.

While the Second Circuit implied that the circumstances which district courts could consider were broad, the Guidelines policy statement continues provide a valuable framework to guide the Court's analysis. *See United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("Like the Second Circuit, we do not see the absence of an applicable policy statement as creating a sort of Wild West in court, with every district judge having an idiosyncratic release policy. . . .  [Section] 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.").  That framework includes an analysis of whether the defendant is a danger to the safety of any other person or the community as provided in 18 U.S.C. § 3142(g).  Further, the Court is statutorily bound to consider the sentencing factors of 18 U.S.C. § 3553(a) before reducing a defendant's sentence under 18 U.S.C. § 3582(c).  *See United States v. Ebbers*, 432 F. Supp.8 3d 421, 430 (S.D.N.Y. 2020) ("[T]he existence vel non of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release—the existence of such reasons does not mandate release.").

The defendant has the burden of demonstrating he is entitled to a sentence reduction.  *See United States v. Stowe*, No. CR H-11-803, 2019 WL 4673725, at *2

(S.D. Tex. Sept. 25, 2019).  Compassionate release, even based on dire medical or family circumstances, should be a "rare" and "extraordinary" event—as Section 3582(c)(1)(A)'s terms connote.  *United States v. Willis*, 382 F.Supp.3d 1185, 1188-89 (D.N.M. 2019) (compiling cases; citations omitted); *United States v. Johns*, 2019 WL 2646663 *2 (D. Az. June 27, 2019).

## III.   Analysis

### a.  Exhaustion

The United States agrees that Lujano has satisfied the exhaustion requirements of 18 U.S.C. § 3582(c).

### b. Lujano Presents No Extraordinary or Compelling Reason for Release

Lujano offers three reasons why he believes the Court should grant him release under § 3582(c).  First, he asserts his asthma places him in an especially risky situation relative to COVID-19.  Second, he desires to spend more time with his minor daughters and his mother.  Third, he argues his record while in custody is so extraordinary that his prison sentence should be reduced.  As shown below, the Court should reject each of these arguments.

### i.     Health Considerations

Lujano states that he suffers from asthma and argues this "condition is made all the more serious due to the COVID-19 pandemic."  Lujano's BOP medical

records show that he has already tested positive for, and recovered from, COVID-19, and he has since declined to be vaccinated against the virus.

Lujano's refusal to receive the COVID-19 vaccine should disqualify him from compassionate release based on concerns of the virus. Several courts have found that "a prisoner should not be permitted to qualify for compassionate release by declining to receive a COVID-19 vaccine, without justification." *United States v. Hill*, 2021 WL 1807285, at *2 (N.D. Ohio May 5, 2021) (citations omitted); see also *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021); *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) (noting that "if an inmate does not present a compelling reason justifying the failure to be vaccinated despite access to the vaccine, a district court would abuse its discretion by granting a motion seeking a sentence reduction under § 3582(c)(1)(A)(i) on the grounds that COVID-19 constitutes an extraordinary and compelling justification."); *United States v. Deleston*, 2021 WL 1731779, at *2 (S.D.N.Y. May 3, 2021). Nothing in Lujano's records suggest that the vaccine might have been medically contraindicated in his case, nor does Lujano even mention his failure to accept vaccination in his motion. His refusal to be vaccinated thus weighs heavily against his claim that COVID presents an extraordinary risk to his health.

With respect to asthma, that Lujano experienced an unremarkable course of COVID-19 suggests his asthma does not make him especially vulnerable to the

virus.  In addition, the documentary evidence suggests Lujano's asthma is not a significant condition.  Lujano asserts he "has suffered from asthma all of his life." Doc. 102, at 3.  His PSR, however, says nothing about asthma.  Rather, the PSR notes that Lujano stated he "enjoys good physical health."  PSR ¶ 76.   Lujano's BOP medical records also confirm asthma is not a significant condition, noting that Lujano does not use "medications/inhalers" and that Lujano "stated that when he runs hard is when his asthma starts."  Lujano cannot, therefore, establish that his asthma is moderate or severe. *See United States v. Smith,* 2020 WL 4047485, at *3 (W.D. Pa. July 20, 2020) (explaining that moderate asthma includes "daily symptoms," "nighttime awakenings more than once a week," the use of a "rescue inhaler on a daily basis," and "some limitation of normal activities," citing the National Heart, Lung, and Blood Institute's Asthma Care Quick Reference Guide). Because Lujano cannot establish his asthma is moderate or severe, the Court should reject Lujano's contention that his asthma warrants compassionate release. *See United States v. Jones*, 17 F.4th 371, 375 (2d Cir. 2021) (affirming denial of compassionate release motion when movant failed to establish moderate or severe asthma, and when there were "few confirmed COVID-19 cases" at the BOP facility).

As noted above, however, even if the Court were to consider Lujanos's description of his asthma, a finding of extraordinary and compelling circumstances would be inappropriate given his vaccine refusal. *See, e.g.*, *United States v. Cheng*,

2021 WL 4502444, at *2 (E.D.N.Y. Oct. 2, 2021) (finding health risks posed to inmate who refused vaccine notwithstanding claim of asthma symptoms did not warrant consideration of compassionate release); *United States v. Robinson*, 2021 WL 1565663, at *3 (S.D.N.Y. Apr. 21, 2021) (denying compassionate release to 34-year-old inmate claiming lifelong asthma, smoking, and obesity, as inmate refused vaccination). He has thus failed to establish extraordinary or compelling circumstances sufficient to warrant release on COVID-related health grounds.

### ii.    Family Circumstances

Lujano argues his "family ties and circumstances more than justify his compassionate release at this time." He states his 64-year-old mother suffers from arthritis in both hands, previously fell and broke her leg, and has retired. Lujano emphasizes that his mother "would very much benefit" if he could help with various household chores. He also explains that he has not seen his two minor daughters in over two years, and the prospects of their prison visits are reduced by the distance between FCI Schuylkill, as well as the current no-vistor policy at that facility. Lujano's motion does not suggest his family is being uncared for, only that he would like to contribute to their care.

Like many inmates, Lujano would prefer to be home with his family. His motion, however, fails to show how that desire constitutes an extraordinary or

compelling circumstance.  "Many . . .  inmates have aging and sick parents. Such circumstance is not extraordinary." *United States v. Ingram*, 2019 WL 3162305, at *2 (S.D. Ohio July 16, 2019).  Similarly, the hardship Lujano's sentence may impose on his family is "unfortunate, but not unusual.  A crime often inflicts harm, not only on a direct victim, but on those in a defendant's circle of family and friends who depend on that defendant for all manner of support." *United States v. Cole,* 2021 WL 194194, at *3 (E.D. Mich. Jan 20, 2021).

Lujano was aware that committing crimes could result in his incarceration that would take him away from family.  He asked the Court at sentencing for leniency on that ground.  The Court's 72-month sentence balanced Lujano's family circumstances against his sentencing aggravators.  The Motion presents no reason to second-guess that balancing.

### iii.    Conduct While in BOP Custody

Lujano also asserts he "has been quite literally an exemplary inmate," and therefore he should enjoy an early termination of his sentence.  As noted above, however, Lujano's record includes at least one disciplinary report for which he received punishment.  Furthermore, while a stellar BOP records should be required for § 3582 relief, it is not sufficient.    Lujano also describes COVID's impact on prison life and resulting limitations on programming, visitation and the like.  Doc.

102, at 3.  Such limitations would have impacted all individuals incarcerated with the defendant, however, and are not specific to Lujano.

Where every prisoner is subject to similar conditions, such conditions are not extraordinary or compelling.  *United States v. Negron*, 2021 WL 3540240, at \*2 (S.D.N.Y. Aug. 10, 2021) (citing *United States v. Pinto-Thomaz*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020)) (noting that "universal conditions do not give rise to extraordinary and compelling circumstances."); *see also United States v. Lischewski*, 2020 WL 6562311, at \*2 (N.D. Cal. Nov. 9, 2020) ("Every prisoner in the facility and other BOP facilities is subject to the similar conditions brought about by the COVID-19 pandemic; Mr. Lischewski has not explained why he should be given special or unique treatment."); *United States v. Wright*, 2020 WL 1976828, at \*5 (W.D. La. Apr. 24, 2020) ("The Court stresses that the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances.").

### c.  Lujano's Release Would Pose a Danger to the Community

As his PSR makes clear, Lujano trafficked in guns and drugs for months, while he was subject to probation supervision by the State of Vermont.  In addition, despite his previous drug felony, he possessed firearms in connection with his drug

dealing, knowing first-hand the dangerousness associated with drug dealing and guns (having previously shot and killed an intruder seeking to steal drug proceeds).

### d.  § 3553(a) Factors Weigh Against Compassionate Release

Lujano was sentenced less than two years ago.  His conviction carried a five-year mandatory minimum sentence.   The 72-month sentence imposed was a substantial downward variance from the 121-month low end of the applicable Guideline range.  That range reflected not only the large quantity of cocaine Lujano distributed, but also his possession of guns.  It also reflected that Lujano previously served a three-year sentence for a felony drug crime, as well as that Lujano committed his federal offense while subject to state probation.

At sentencing, Lujano emphasized his desire to care for his minor children and urged the Court to impose the mandatory minimum sentence.  The Court carefully weighed Lujano's claimed devotion to his family, against the fact that Lujano knew first-hand that drug trafficking could result in years of incarceration. Lujano's instant motion provides the Court with no reason to believe his children are not currently receiving care.

His record of re-offending, and offending while subject to court conditions, demonstrate the Court should not re-consider the already lenient, and relatively recently imposed, 72-month sentence.

## IV.    Conclusion

For the reasons explained above, the Court should deny the motion.

Dated at Burlington, in the District of Vermont, January 5, 2022.

Respectfully submitted,

UNITED STATES OF AMERICA

NIKOLAS P. KEREST
United States Attorney

By:  */s/ Michael P. Drescher*
Michael P. Drescher
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Michael.drescher@usdoj.gov